Fourth and final case of the day, Scott Driggers et al. versus the City of Daytona Beach, 24-12-662 and 24-12-964. We've got Mr. Kham here for the appellant, who's done here for the appellees. Mr. Kham, whenever you're ready. Thank you, Judge Newsom. I'm trying not to move the mic, as I was told to do, and I was trying to use the button, which I wasn't sure I could do. Very well. Judge Newsom, I wanted to . . . I had a presentation, but as soon as you said everything you said initially, it was like I needed to rip it up and get right to the points you made, and that is . . . You've only got so much time, so . . . That's true, and I appreciate that, Your Honor. Why this case should be remanded is because it gets right to the point that actually both parties . . . oops, excuse me. Both parties had submitted a request for a hearing in this case. Certainly, the defendant wanted a hearing for many, many reasons because we believe, and the case law is very clear, that there were a number of different . . . as a matter of fact, I've had to write them down, there were so many, bitterly disputed facts and or genuine issues of material fact that the case law is very, very clear that there should have been a hearing that was granted by the district court and wasn't. We feel that the case would have benefited for that because there's a lack of clarity in the record because there wasn't a hearing, and there were so many factual issues that when the district court granted the motion for summary judgment, and in essence, it was mooted with regard to the preliminary injunction, that there were other things that were mooted or were denied as moot. We had doubted motions. The plaintiffs in this case can say all they want. The different things that they've said about factual issues, and they've said several different things, one, they said they're immaterial, two, they said there were no disputed issues, there were no factual issues, but just rhetorically speaking, to begin with that, if they believe there was no factual issues, why were there nine fact depositions that were taken? Why were there four more, there were actually more, thirty-six depositions that were taken? There was an extensive legislative record that comprised ten hours, twenty-four witnesses and four hearings. There's a plethora of factual issues, and there should have been a hearing that was granted with regard to this, and that the genuine issues of material fact, as in the first order, the district court put out the exact rulings or premises regarding summary judgments, and it's the plaintiffs who have the burden of saying that there are no genuine issues of material fact. The burden is on them, and then it shifts to us, and we believe they failed at that burden. Let me ask you this, what factual issues are we talking about? I guess I want them to be paying attention because I think there might be some genuine issues of material fact from my perspective with respect to standing to challenge particular provisions. You really haven't done much with standing, I think we've got to address it anyway, but if we get through to the merits, what kind of factual issues are we talking about? Well, thank you for asking, Judge Neusman, and my apologies to Your Honors for having to actually look at a piece of paper here because I had to write it down, but I want to talk about . . . But Joe Flatt is the only one in the courtroom who never has to look at a piece of paper. I believe you. I believe you and have been very impressed by the active questioning of Judge Joe Flatt and his obvious intelligence. The bottom line is that just regarding even standing, we have an issue . . . I'll use the word cute, issues regarding standing here that need to be mentioned. One is the aggressive panhandling issue. Now, in the original affidavits and pleadings of the plaintiffs, they take great pains to say how courteous they were and if somebody refused them, that they would say thank you and they would just walk away. They took a lot of pains to say that and it was only after the aggressive panhandling issue was brought up. It wasn't even in an affidavit. It was in an answer to an interrogatory that said, well, if the court finds that aggressive panhandling is unconstitutional, we might want to do that. I'm just shrugging my shoulders at that saying, is that credible? Credibility is big with some of the facts that I'm going to be talking about because there's a lot of facts. As a matter of fact, you know, the court says and names the four counts of challenged what the court calls, district court calls, challenged provisions and then says . . . I can't remember the page, but the district court says that the parties dispute the content-based nature of the challenged provisions. Every one of those disputes, Judge Newsom, to your question, are factual issues that need to be talked about. For example, the location. If you look at the difference in the way the ordinance is structured, it's definitely the city believes that it's a content-neutral ordinance per Austin and what Austin's effect on Reed was . . . None of this, maybe this is the source of my confusion, like none of this, like whether it's content-based, content-neutral, Reed, Austin, all of this, like none of that has anything to do with facts. No, but there are facts within them. For example, I'll just . . . excuse me for turning away from the microphone for a second. The plaintiffs, I'm going to just start here, in their own answer brief talked about facts, and they talked about facts, for example, there's an issue of public health that came up, both in strict scrutiny and in intermediate scrutiny. The city believes that it's a unique ordinance that we have here, unlike the homeless ordinance in Tampa and unlike Hagener, that we are directly addressing, and we may be the first ordinance in the country, we're not sure, we may be, that are directly addressing strict scrutiny. What the defendants did in their brief, they said there were two . . . as far as the public expert goes, excuse me, as far as the public expert goes, there are . . . the plaintiffs had an expert whose name is Dr. Greer, and the defendants had an expert, the city had an expert, Dr. Miles. Dr. Miles gave enactment statements, he gave an affidavit, and he gave two depositions in which he claimed that open defecation and open urination, one could kill elderly and could kill children, and it was a habit of panhandlers, and the hand-to-hand transmission of money was potentially dangerous. Can I just . . . I hate to interrupt you, but you've only got two minutes left. One of the moves that you make in your brief is to say, you know, look, the Supreme Court has said that bans on solicitation are content neutral. This ordinance prohibits, among other things, solicitation, therefore we're good to go. Um, is, like, would the ban on . . . I take the word solicit in this ordinance to mean something a little different because it's a subset of panhandling. So the ordinance wouldn't prohibit, for instance, solicitation with respect to Girl Scout cookies or something, would it? Uh, well, uh, no, it would . . . What I'm calling, I guess what I'm calling a non-panhandling solicitation. No, I think it would. Okay, a solicitation with a fireman's boot solicitation, in other words, it's not a . . . panhandling is a . . . the district court called it a subset, but if you look very carefully at the definition of panhandling, okay, it's, first of all, I think it's this court that said that the terms begging, panhandling, and solicitation can be interchanged. I can't remember the case that it did, but I think it did in this court. So, there's a lot of sub-issues about narrow, uh, tailoring, um, about, um, the . . . Just to, just to answer Judge Newsom's hypothetical, if someone was selling something, that would not fit under this ordinance, right? This ordinance prohibits someone asking for donations. Right. You're right. As a matter of fact, excuse me, Judge Newsom, that's absolutely correct, and thank you, Judge Bradshaw, for focusing me on that. There's actually another ordinance that, that Daytona has, um, I think it's ordinance 62-32 that talks about the selling of, uh, of, of items from a, from a car or involving a car. There's another, uh, so, that's an important other point because we believe that the court erred, the district court erred in its construction, in its interpretation of the construction of the ordinance by saying that all the ordinance did was deal with charitable, um, um, uh, organizations when that's not true. It dealt, political solicitations would be covered, um, uh, religious solicitations would be covered, anything that has an immediate donation of money would be covered. Well, let me ask you this. Why does that solve the problem? It seems to me that all you're really saying there is within a content category that is defined at the top level of immediate, uh, demand or request for immediate donation of money, within that content category, it is sort of neutral as among subcategories, um, but it seems to me that that, and you could chase that on down the line all the way to viewpoint discrimination, I suppose, you know, there's, there's some weird spectrum that exists between content discrimination and viewpoint discrimination, and the more granular you get, the more viewpointing it gets, right?  So, but, but why does that solve what seems to me the top level content discrimination that this doesn't apply to all manner of speech? It applies to one kind of speech, namely the kind of speech by, by which I request or demand an immediate donation of money. Why is that not targeting a particular topic or subject area, as the court says in Austin, even sort of riffing on Reed? Well, I think that the answer to that directly is that the, uh, there's, there's two points that the city makes with regard to its ordinance. One is that it's a time, place, and manner ordinance, um, But a time, place, and manner ordinance that only applies to one particular type of speech. Well, it is the time element. In other words, the time element of the time, place, and manner is immediate, and we briefed this, we put this in our brief, is it the immediate donation of money. We, we think that's a time, uh, uh, uh, element. The place element is the geographic limitations, um, and, you know, I can go into that. So I think that you could look at it from a time, place, and manner, um, because that's really what happens with content neutrality. With content neutrality, it starts off in Austin by saying something brand new. Like the plaintiffs say that Austin didn't do anything to Reed, and they actually cite a case that said, the National Federation of Blind case that said, well, it was just the Fifth Circuit that interpreted Reed in a certain way, and that's absolutely wrong. Okay, the, the, the, um, uh, the Reed, uh, or the, the Austin case said for the first time, and I really like to, uh, kind of focus on Judge, Justice Breyer's, um, concurrence in both Reed and Austin, to say the following, solicitation can be regulated, quote, unquote. These were two sign cases. These were two sign cases. Why did they do that? Why did the Supreme Court do that? I can rhetorically answer that question, but I don't know, but they said it. And they said they're inherently content neutral, unless they just. I thought that the majority opinion in Austin, citing Hebron, says that, uh, that solicitation bans are content neutral so long. Right. As they do not discriminate based on topic, subject matter, or viewpoint. Right. And we would say that solicitation, uh, for, solicitation, uh, of an immediate donation of money is, is not a per se topic. It's a category, or it's the time element of the time, place, and manner after the, the content neutrality is established by Austin. In other words, Austin establishes the content neutrality of a solicitation ordinance. That's what, um, Daytona's ordinance is. It's a solicitation ordinance. So it begins with content neutrality, unless it discriminates.  I'll tell you what, I've, I've taken you way over. Let me ask Judges Brasher and Chouflette if they have additional questions. Yes. No. Okay. So let's hear from your adversary. Okay. We've got some rebuttal time coming to you. Good morning, your honors, and may it please the court. My name is Chelsea Dunn and I represent the plaintiffs at police in this matter. We are here today because if the city of Daytona Beach has its way, any one of the plaintiffs could be subjected to arrest and jail time for expressing a message of need for support and assistance. Can I ask you a standing question at the outset? And I promise I'm not going to make you march through all 18 challenge provisions. It would take us all day, but do you agree that under our decision camp that we've got to do this on a provision by provision basis? I mean, isn't that what camp says? I think that's right, your honor. So by what authority did the district court lump these into four categories and then say, in essence, standing as to one provision within the category, standing as to all? I don't think we can do it that way. Well, I think that it makes more sense to do it that way under this ordinance because these categories of ordinance contain overlapping, they overlap with each other. And so you might be violating the categories that the district court use are, for example, the traffic related restrictions. And so within that category, you have a provision that prohibits requests for donations within a certain distance of an intersection, but also aggressive panhandling to vehicles. And so the same conduct would fall within both of those, could fall within both of those. And that, I think, is a good example for showing how plaintiffs have standing under both of these provisions. So multiple plaintiffs stated both in declarations and in interrogatories that they request charity, they panhandle near intersections, they sometimes approach cars, and they also have in their interrogatory responses stated that sometimes they make a request more than once or do so within two feet of a person. And so ... What about, maybe the best example of my hangup on some of these is like the C-4 provisions. C-4, D through H, prohibits panhandling, standing in line at a commercial establishment, prohibits panhandling by touching someone, prohibits panhandling using profane or abusive language. I don't see anything in this case that would indicate that your clients feel chilled with respect to those provisions. So there is evidence that some of the plaintiffs do make requests near businesses, near the entrances or exits of businesses where there might be lines, where they're near public dining, outdoor dining areas, on the boardwalk where, again, there are many overlap. So I think, for example, Plaintiff Doug Willis, he makes requests for charity in and around the Daytona Beach Boardwalk. And in those areas, this ordinance restricts charitable solicitation on the boardwalk generally, but then also in areas near the boardwalk where there are, or many of those things that you're mentioning exist. So if you're in and around downtown Daytona Beach, you are likely standing near an outdoor dining establishment. You're likely standing near a business where there might be a line to enter, or another one of these examples, the entrances or exits of commercially zoned property. I don't know that there is evidence that any of our plaintiffs explain ... Oh, hold on. Microphone just went off. I don't know why. But I can tell. Don't worry. We'll let you go a little over if you need to. Don't worry. So, for example, Plaintiff Willis, I think, has standing to challenge a number of these provisions in the C-4, merely because he makes these requests as he wanders around the Daytona Beach downtown and boardwalk area where you will find many of these prohibited locations. I think you might have been about to say, and then I'll drop this because I know it's not what you want to talk about, but I think you might have been about to say, I'm not sure there's evidence that anybody wants to use profane language or use a gesture that's designed to intimidate or something like that. I am not sure. I agree. I do not believe that we have evidence on the record that explicitly says that the plaintiffs intend to engage in requests for charity that include profanity. I'll leave it alone. Thank you. It's moving to the, just to direct you back to kind of the merits, I mean, could you address Smith? And so our decision in Smith, we say that an anti-begging ordinance is content neutral. And what do we do about that? The only holding in Smith that is binding on this court is the holding that, again, was recently reiterated in Singleton versus Secretary of Alabama Law Enforcement, which is that panhandling or begging is protected speech. The procedural posture of Smith is important here because plaintiffs in that case had conceded that the ordinance at issue, which in Smith was an ordinance restricting begging in the beach area of Fort Lauderdale, they had conceded that it was content neutral. They had also conceded that the government had a significant interest, and they had conceded that there was adequate alternative channels of communication. So the only inquiry for this court in Smith was whether that ordinance, which restricted begging on a part of the Fort Lauderdale beach, was narrowly tailored. And under the facts of that case, this court found that it was narrowly tailored. But that is not binding because it is an application. It is not actually the holding that would restrict this court today. So in order to consider whether this ordinance is narrowly tailored, you would look at the facts in our record. I think it's all too important to... Apart from the narrow tailoring, I guess, just go back to the whether this is content neutral or not. So the way, I mean, I think there's some, I mean, this is not shocking, there's inconsistency between Austin and Reed. It seems like Austin, the reasoning in Austin is, look, a billboard that advertises something that is located on the property of the billboard is just like an inherently different kind of speech than a billboard that advertises something that is not located on that property. That seems to be the Supreme Court's reasoning there. One, I guess one question, do you think that is the Supreme Court's reasoning? And two, if that is the Supreme Court's reasoning, isn't a request for immediate money different than sort of a, hey, like, we'd like you to think about donating to the church at some point or something like that? So going, I think, back to the first part of your question, this ordinance is content neutral because it makes distinctions based on what a person says. I mean, not content neutral. I'm sorry, content based. Yes, I apologize. It is content based because it makes distinctions based on what a person says or what words are on the sign. And I think looking at- But isn't that exact, if that's all, that's exactly the case with the City of Austin. And I missed, I should say what the words on the sign say, like what their topic or subject matter is, which is, are they about requests for donations? What Austin did is it looked at interpretation of Reed that had been adopted by several circuit courts, which said that if you have to read the sign at issue, it's content based. And Austin said that is a little bit too far. We can read the signs. We can read a sign and look at what it says, as long as we're not distinguishing based on subject matter or topic. And so in Austin, what the regulation applied based on a characteristic incidental to speech, whether or not the thing being promoted was located onsite or offsite, right? Because that's a location-based distinction. I'll point the court to a case called Camp Hill Borough Republican Association versus Borough of Camp Hill, which was not cited in our brief, but was in an amicus brief filed by a group of law professors and instructors. In that case, the court, the Third Circuit, articulated the way we apply Austin and Reed consistently. And it said this, to tell if a category is based on the sign's content, we ask how an ordinary reader would know what category a sign belongs in. If he can do so by judging the sign's content-neutral features, like size or location, the category is content-neutral. And then the court cites to City of Austin. So I appreciate that. I guess I want to push on that a little bit, though, because that's not entirely true, right? I mean, you don't know based on the location of the sign. You just have to read the content of the sign in connection with the location, right? You can have a sign that said, you know, Boot Barn, 10 miles down the road. That's regulated one way under City of Austin. And a sign that says Boot Barn, here, is regulated a different way, right? Like the here and the 10 miles down the road is what makes the difference. So that's true. But the reason the ordinance applies isn't because of, in City of Austin, the reason the ordinance applied wasn't because of the subject matter, topic, or viewpoint. It wasn't because of the message, right? It was because of some extrinsic feature. And so here, I think the analogy that the city is drawing is saying, here, in City of Austin, there was this location-based element. You know, you can say Boot Barn on your own property, but you can't say Boot Barn down the street. And they're just saying, here, we don't have a location-based element. We have a time-based element. So you can hold a sign that says, give me money tomorrow, and that's perfectly fine. But a sign that says, give me money right now, is the problem. And so why isn't that, I mean, if, I mean, look, I don't entirely know how to understand City of Austin, but isn't this time-based element sort of the analogous thing to the geography-based element? Well, the time-based element goes to when the donation is received, not to the speech itself. Right? So the speech that is being regulated is whether or not you're requesting a donation. And the city's trying to obscure the fact that the request is what is being regulated, not when you receive the donation. It's similar to the fact that the ordinance doesn't discriminate between whether you're making a, requesting a donation for religious purposes or political purposes. That is just kind of the second level, right? The first level is, is a request for a donation being requested? And I think a good example of why this, for example, why this is content-based, if you look back at the Camp Hill case that I was just talking about, in that case, you had a ordinance that distinguished between personal expression signs. And personal expression signs were subjected to more, to a higher level of restriction than commercial signs, for example. And so the court said, because you're distinguishing between commercial and non-commercial speech, that is a content-based distinction. Similar here, we're distinguishing between speech requesting charity or soliciting charity and speech soliciting a commercial transaction or signatures on a petition or speech soliciting a, you know, offering tickets for sale, scalping. So those, the second group that I talked about, the tickets for sale, the signatures on a petition, the commercial transactions, those types of requests are not regulated. The request that is regulated is a request for charity. And so the city is making a distinction based on what someone is asking for. The words, um, the, you know, the message being expressed. And it's not just that it's a request for a donation. It's that requests for donations implicitly carry a message, a social, economic, political message. Can I ask you a question about this? I think in some ways his best case is this Fifth Circuit case, National Federation of  Do you think there's a meaningful distinction between this case and that one, or do you think in order to rule for you, we just have to say the Fifth Circuit got that wrong? No, I do think there's a meaningful distinction. In the National Federation for the Blind out of the Fifth Circuit, um, the court looked at that, uh, regulation, and while it did regulate donation boxes, it didn't apply based on the signs on those boxes or, um, what the, the message that was being sent was. Um, and in fact, the court in the Fifth Circuit said that this is non-expressive, non-communicative conduct, or content, excuse me, or, I'm sorry, this regulation is based on non-expressive, non-communicative factors. Um, and I think that's different here because we know that the plaintiffs are engaging in direct in-person communication, the same sort of, uh, communication that was at play in McCullen versus Coakley, where we know that it doesn't even meet intermediate scrutiny to provide a buffer zone around abortion clinics because it bars the messages of individuals who want to, uh, send pro-life messages to people who might be entering those clinics. Um, similarly here, uh, these in-person communications are a part of plaintiffs expressing their messages, um, and so that was very different than what was at play in National Federation for the Blind, where we're just talking about where they locate certain receptacles. I think, um, going back to the issue of whether there are material facts, material disputed facts, um, in the city's briefing, there are many, many facts referenced, but in order to prevail, um, and demonstrate that summary judgment was not proper in this case, the city has to point to specific facts on the record that demonstrate a genuine issue for trial. And while the city says that these facts are material, and it lists many different disputed facts, it never explains why those facts are material to the decisions that the judge was making in this case. Um, so, I see I'm out of time, um, so I will just say that Daytona Beach, um, in enacting its panhandling ordinance, enacted a content-based regulation of speech that cannot survive strict scrutiny. We ask you to affirm the district court's decision. Very well. Thank you very much. Mr. Comm, you've got five minutes of rebuttal remaining. Thank you, Your Honor. Crank that down a little bit. I was just going to say, because Ms. Dunn's taller than I am, I've got to bring it down. We disagree, of course, about National Federation, uh, and the Sixth Circuit actually has said something that's blatantly, uh, uh, apparent to, uh, looking at the case. And the Sixth Circuit said that these donation box speak, and of course they speak. It's what the message says, and what, uh, National Federation says is we don't care, it doesn't say we don't care who speaks, we don't care, um, uh, what their motive of speaking is, um, it's the fact that they can be regulated, the donation boxes can be regulated, so it is directly analogous to Daytona Beach's, uh, ordinance. And it's important because that ordinance itself is important. And I could go on again with, um, as Ms. Dunn said, literally dozens of facts that would be, uh, genuine and material, um, uh, issues of fact that mandate a, uh, uh, a remand. And it's good. Can I ask you one question before you get into the facts? Sure. About National Federation? Sure. Even sort of at like a more, maybe it's impressionistic or metal level or something, but is this case sort of more core First Amendment-y than, uh, than National Federation in the sense that here you've like actually got words pouring out of people's mouths. There, it's some nameless, faceless box. Well, I would answer no. I would answer no, and I would, uh, point to the, uh, Otto case as we briefed it. Defining what constitutional facts are, and they're facts that basically just go right, as opposed to, uh, ordinary facts. It's a de novo review by you, um, your important case. And even again in their own brief, they're, they're talking about, um, um, um, um, disputed facts. I named one with Miles, Dr. Miles against Dr. Greer, as far as public health. When you talk about, um, the geo, or alternative avenues of communication, which certainly should be considered in this case, we have two dueling experts. Again, the case law says dueling experts, uh, like the Bruni case versus Pittsburgh. Um, I think that's one of the cases, and there's a ton of other cases that say dueling experts mean, um, a remand and no summary judgment. And it helps this court because it clarifies the record for it, for you, okay, to have a full record where, and I'll say it in a, in a colloquial way, where the district judge gets it right after a hearing, instead of denying Daubert motions, instead of, but hearing because the case law also says that the district court shouldn't have any business dealing, or only the district court in a trial should deal with credibility. Credibility of witnesses, credibility of Miles, credibility of Greer, the, um, um, alternate avenues of communication are, we have John Clary who says that 97.5% of Daytona Beach is available for panhandling. That is a very important finding. It's contravened by their expert, Ms. McCauley, who says that you can't, incorrectly I might add, you can't, um, panhandle or solicit in private property. But that's only two. They then bring into, there was a St. Augustine ordinance that was done exactly to face these facts. They say it doesn't matter. They say it doesn't matter because I drafted it. Oh gee, I'm sorry. Okay, I drafted it. But it does matter. It shows the city as being deliberative, as facing the same problems, and having a very successful ordinance with the same issues. And we feel that's important. They say it's not important. That's a factual issue that should be debated. By their, uh, uh, uh, accordance, um, um, they're bringing up a new one, okay, which never was really fully briefed, but they say that the purpose of the ordinance was to discriminate against the poor. Okay, well that's never even in, in the brief. But what a great central disputed issue that would be, because we would definitely object to that. It's a factual issue. Um, the, um, documented traffic fatalities. They say there's not enough evidence. The court says. Can I ask you, can I ask you just on the strict scrutiny? Sure. It does seem like there are other things the city could have done to address some of these problems. I mean, I assume there's already a law against public urination, public defecation. I assume you could have a law, um, that is against loitering in general, and things like that. Like what, why, why do you need a law that specifically is targeted at panhandling? Okay, I don't know that there's a state law against open defecation. I know there is not. I'm just saying you couldn't have the city. You could have, and about loitering, whatever. There was testimony in a 30B6 deposition, your honor, about that exact same issue by the deputy city manager. And what he said about loitering and the other potential things that they brought up in their depositions, because in every deposition they brought, well couldn't you use loitering? Couldn't you use this? To, uh, for example, uh, traffic investigator Rossi, who said that she saw deaths of panhandlers and by other, and other people by panhandling. And so she was asked, shouldn't you use it? And so here's what, uh, deputy city manager, uh, uh, Morris said. He said, we can't, they're too ephemeral. Those issues are too fleeting. A panhandling ordinance, it was the discretion, it comes down to this. There's case law that says that, that the court cannot substitute itself for the discretion of the city council or, or, or state in trying to solve a serious problem. How about a serious, and what. Can I ask you just a quick question? Sure, sure. So, I mean, you represent the city. It's my understanding, and you can tell me if this is wrong, that Daytona Beach has a disorderly conduct ordinance that makes it unlawful to defoul or disturb public or private property of another so as to create an unsafe, unhealthy, or unsanitary condition. Why isn't that directly responsive to Judge Brasher's question? There's an existing ordinance that covers this stuff. Well, because there's other issues. If, if I looked at it, and if I, I accept your Honor's representation, and I think it would, with a slight stretch, with defoul and defecation and open urination, but the answer is that there's also a linkage to that, that's a factual issue that they, that the plaintiffs are opposing that, that relates it to panhandlers. So what the plaintiffs would say directly to your Honor? I think the plaintiffs would say if your, if your aim is to prevent the unsanitary conditions that come with public urination and defecation, then enforce the, enforce the ordinance that is on point. Don't do this, like, regulate by indirection thing. If that's what you want to do, regulate it directly. No, it's just one of the issues, though, your Honor. You're, you could be right about that one issue, but I'm not sure if we were to put that out, if it was like every other issue that we would put out, okay? That's why there's so many factual issues here that need a remand, okay? It, they would oppose it, and they would merely say to your Honor this. They would say, that's fine, that law exists, but how can you relate that to panhandling and the evils that panhandling did? Because that's what they're doing with the open defecation and open urination that Dr. Miles is testifying to. It's not like they would accept and say, oh, gee whiz, you're right, here's an ordinance and that's, that solves that problem, which leads me to another point. Yeah, last point. Okay, last point is this, that case law also says, also says, that we don't have to solve, the city doesn't have to solve everything at one time, and they should be given deference by this court to solving very tough problems. Like, we get challenged by under-inclusivity and over-inclusivity, et cetera, and the point is this, if you look at this case very carefully, Judge, like the Messina questions that are asked within the brief, the neat, and I'm using a colloquial word for this ordinance, part of this ordinance is Daytona Beach went to a great deal to minimize the speech, because you know what? You can ask all these questions other than immediate donations of money, and you can ask them any time, including after dark, and so they went to a great deal of deliberation in creating an ordinance that would protect the city, but people are dying, and the power of Austin is going to be reckoned with one way or another. Austin, and I wanted to slightly disagree. All right, I'm going to have to ask you just to kind of wrap it up. Take 10 seconds and wrap it up. Austin rejected read on certain points. It rejected read to say, you can read, just because you, no pun intended, you can read the billboard and the donation boxes, but if it's not for the content of speech, and here it's for the time aspect of the time, place, and manner, then it's okay to have it, so you can read it, and also you begin with the fact that solicitation is now, thank God, regulatable. Thank you very much. Thank you so much. That case is submitted. We'll be in recess until tomorrow morning at 9 a.m.